UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    **Plaintiff,**

  v.            Case No. 04-CR-307

**ERIC ROBINSON,**
**JARRETT RICHARDSON,**
**RAMOND RICHARDSON,**
**ERNEST JABAR MARTIN,**
**DEANGELO WYATT,**
**DARNELL VEASEY, and**
**JAMES WALKER**

    **Defendants.**

## ORDER ON THE DEFENDANTS' PRETRIAL MOTIONS AND RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA

  On December 28, 2004, the grand jury returned a fifteen-count indictment against the defendants. All counts relate to the defendants' alleged drug trafficking activities. Several of the defendants have filed pretrial motions. Currently pending are: two motions to strike the sentencing allegations from the indictment; a motion to dismiss 21 U.S.C. § 851 information; a pro se motion to dismiss filed by Deangelo Wyatt; and two motions to suppress. In addition, on April 25, 2005, Wyatt filed a motion to sever that was withdrawn shortly thereafter. Accordingly, that motion will not be discussed further herein. All other motions have been fully briefed and are now ready for resolution. A jury trial is scheduled to commence before the Honorable Rudolph T. Randa on June 6, 2005, with voir dire set for June 2, 2005.

## VEASEY'S AND WYATT'S MOTIONS TO STRIKE THE SENTENCING ALLEGATIONS

Darnell Veasey ("Veasey") and DeAngelo Wyatt ("Wyatt") each filed a motion to strike the sentencing allegations that are currently contained in the indictment. Although Veasey recently entered a plea agreement as to the charges against him, Veasey's motion will be discussed because it asserts the same grounds presented by Wyatt. Both defendants claim that the sentencing allegations are prejudicial surplusage under Federal Rule of Criminal Procedure 7(d) and that the inclusion of the sentencing allegations is inconsistent with the recent Supreme Court decision in United States v. Booker, --- U.S. ---, 125 S. Ct. 738 (Jan. 12, 2005).

The government previously requested that the grand jury include sentencing allegations in many of its indictments, including the one at issue here, in attempt to comply with the Supreme Court decision in Blakely v. Washington, --- U.S. ---, 124 S.Ct. 2531 (2004) and the subsequent Seventh Circuit decision in United States v. Booker, 375 F.3d 508 (7th Cir. 2004), cert. granted, 125 S.Ct. 11 (U.S., Aug. 2, 2004). Blakely held that the Washington sentencing guidelines were unconstitutional to the extent that they permit increased sentencing based on facts not determined by a jury. 124 S.Ct. at 2537. Booker held that the federal sentencing guidelines cannot be distinguished from the State of Washington sentencing guidelines that were declared unconstitutional in Blakely. 375 F.3d at 511, 512-13.

On January 12, 2005, after the indictment had already been returned, the Supreme Court issued its decision in United States v. Booker. --- U.S. ---, 125 S. Ct. 738. The Court held that the Sentencing Guidelines are now advisory rather than mandatory and rejected the position that the sentencing allegations must be submitted to the jury for proof beyond a reasonable doubt.

2

Accordingly, there is now no need to include sentencing allegations in an indictment, and the court will grant the defendants' motions.

### WYATT'S MOTION TO DISMISS 21 U.S.C. § 851 INFORMATION

On December 30, 2004, the government filed an information regarding the criminal history of Deangelo Wyatt. The court will consider the information for purposes of sentencing if Wyatt is convicted of the charged offenses. 21 U.S.C. §§ 841(b) and 851. The information states as follows:

> 1. On or about August 26, 1997, Deangelo B. Wyatt, the defendant herein, was convicted of a felony drug offense, namely Possession With Intent to Deliver – Cocaine, in Milwaukee County Circuit Court Case No. 96-CF-4921.
>
> 2. With respect to the above offense, Wyatt was sentenced to 14 months' incarceration. Filed pursuant to Title 21, United States Code, Sections 851(a), 846, and 841(b)(1)(A).

Wyatt filed a motion to dismiss the information, claiming that judicial fact-finding to increase an accused's minimum sentence violates the Sixth Amendment. In support of this claim, Wyatt argues (1) that Almendarez-Torres v. United States, 523 U.S. 224 (1998)—which held that courts may use a prior conviction to enhance a defendant's sentence regardless of whether the conviction was charged in the indictment or proven to a jury beyond a reasonable doubt—no longer remains binding law and (2) that, under Apprendi v. New Jersey, 530 U.S. 466 (2000), the jury must find any fact, including prior conviction, that affects the mandatory minimum sentence. (Wyatt Br. 4, 10.).

According to the government, recent Seventh Circuit decisions reject the two positions that Wyatt asserts. In opposition to Wyatt's claim that Almendarez-Torres no longer remains in effect, the government cites United States v. Paladino, — F.3d —, 2005 WL 435430 (7th Cir. Feb. 25, 2005); United States v. Martin, 399 F.3d 879 (7th Cir. 2005); United States v. Harris, 394 F.3d 543, 560 (7th Cir. 2005); and United States v. Pittman, 388 F.3d 1104, 1109 (7th Cir. 2004). (Gov. Resp. 2-3.). In

3

opposition to Wyatt's claim that all facts, including prior conviction, affecting the mandatory minimum sentence must be submitted to the jury, the government cites United States v. Harris, 536 U.S. 545 (2002); Paladino, 2005 WL 435430 at *6; Pittman, 388 F.3d at 1109; and United States v. Edwards, 397 F.3d 570, 573 n. 2 (7th Cir. 2005). (Gov. Resp. 3-4.).

All of these cases make clear that, when the potential sentence enhancement is based on uncontested facts, such as a prior conviction, Almendarez-Torres remains binding on this court and that Apprendi does not apply. Accordingly, the court will recommend that Wyatt's motion be denied.

### WYATT'S PRO SE MOTION TO DISMISS

Deangelo Wyatt, acting pro se, filed a motion to dismiss the indictment, which charges him with conspiring to distribute controlled substances (Count 1) and distribution of heroin (Count 9). Wyatt claims that the indictment fails to state elements of the charged offenses—namely, the amount of controlled substances and the range of penalty. (Wyatt Br. ¶ 2.).

In determining whether an indictment is sufficient, the court considers whether the indictment (1) states each element of the alleged offense; (2) provides the defendant with information adequate for the preparation of his defense; and (3) provides a sufficient basis for a judgment that would bar any subsequent prosecution for the same offense. United States v. Hausmann, 345 F.3d 952, 955 (7th Cir. 2003)(citing FED. R. CR. P. 7)). The test for validity of an indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards. Id. (citing United States v. Allender, 62 F.3d 909, 914 (7th Cir.1995)). In analyzing the sufficiency of an indictment, the court reads the indictment in its entirety. United States v. Hoag, 823 F.2d 1123, 1126 (7th Cir. 1987)) and refrains from reading a count in a hypertechnical manner. United States v. McNeese, 901 F.2d 585, 602 (7th Cir. 1990).

4

In the present case, the indictment adequately sets forth all elements of the charged offenses, both of which are based in § 841. A conviction under § 841 requires that the jury determine, not only the elements of the offense that appear in § 841(a), but also the events listed in § 841(b) on which the prosecutor relies to establish the maximum sentence. United States v. Brough, 243 F.3d 1078, 1080 (7th Cir. 2001)(citing United States v. Nance, 236 F.3d 820 (7th Cir.2000) and United States v. Westmoreland, 240 F.3d 618 (7th Cir.2001)). But, even if the trier of fact does not find any particular drug or quantity, a convicted defendant still faces some penalty, if only the penalty for distributing the least serious of the Schedule V drugs. Id. (citing 21 U.S.C. § 841(b)(3). Here the indictment, alleges one of the unlawful acts prohibited by § 841(a)—distribution of a controlled substance. In addition, and contrary to what Wyatt asserts, the count one also states a drug quantity that satisfies § 841(b): "[t]he offense involved one (1) kilogram or more of a mixture and substance containing heroin, a Schedule I controlled substance." Accordingly, the court will recommend that Wyatt's motion to dismiss be denied.

## WYATT'S MOTION TO SUPPRESS

Wyatt filed a motion to suppress evidence of seized from the residence located at 5244 North Teutonia Avenue, Apartment #1, on November 5, 2004. As grounds, Wyatt claims that law enforcement officials entered the residence without consent or a warrant.

On April 11, 2005, this court held an evidentiary hearing to address Wyatt' motion. Wyatt appeared in person and by his attorney, Nancy Joseph. The government appeared by Assistant United States Attorney Richard Frohling. Testifying on behalf of the government were Milwaukee Police Detective Lynda Stott ("Stott") and Milwaukee Police Officer Jose Medina ("Medina"). In addition,

Wyatt's girlfriend, Carmen Reed ("Reed"), testified on his behalf. The witnesses' testimony as to consent is summarized herein.

### I. Detective Stott and Officer Medina

Detective Stott and Officer Medina presented similar testimony regarding the entry and search of the Teutonia Avenue residence. Stott and Medina were investigating a number of complaints in the area with the hope that information regarding the shooting of Special Agent John Jay Balchunas might be obtained. They received information that drugs were being sold out of the Teutonia Avenue residence and intended to conduct a "knock and talk" investigation with a resident at that location, whom they believed to be named Omar.

According to Detective Stott, Officer Medina and another officer went to the back of the house, while she knocked on the front door of the residence. Wyatt opened the door slightly, leaving the chain lock attached. Detective Stott identified herself, told Wyatt that she was investigating a drug trafficking complaint, and stated that she was looking for an individual named Omar. Wyatt said "wait one minute," shut the door, and Detective Stott temporarily lost sight of Wyatt.

Officer Medina encountered Wyatt next, when Wyatt opened the back door of the residence and stepped just outside. Officer Medina identified himself and asked to speak with Wyatt in connection with a drug trafficking investigation. According to Medina, he also asked to enter the residence, and Wyatt gave his consent. Although Wyatt repeatedly asked Officer Medina "what is going on?" and "why are people messing with me?", Wyatt conducted himself in a friendly and casual manner.

Officer Medina, along with another officer, then entered the residence without physically touching Wyatt and without incident. Upon entry, Officer Medina walked through the living room,

6

where Reed was standing, to let Detective Stott and a fourth officer in through the front door. Wyatt persisted in asking "what is going on?" and "why are people messing with me?" At some point, Wyatt became argumentative. He asked whether the police had a search warrant, and Detective Stott said they did not. In addition, Detective Stott explained that a search warrant was unnecessary if Wyatt consented to a search and advised Wyatt that consent "would be easier" than obtaining a warrant. Wyatt stated that he had nothing to hide, claimed that he wanted the matter resolved quickly, and gave his consent to search the residence. The officers then began their search. They recovered a taser gun, a scale, and a small plate containing cocaine residue from the bedroom. Wyatt conceded that these items belonged to him and was arrested.

### II. Carmen Reed

Reed was visiting Wyatt on November 5, 2004 and observed law enforcement officers' entry and search of the Teutonia Avenue residence. Her testimony, although largely consistent with the testimony of Detective Stott and Officer Medina, differed in several respects. According to Reed, Wyatt answered the front door in response to the officers' knocking. Reed, positioned directly behind Wyatt, heard Detective Stott identify herself and claim to be investigating a drug trafficking complaint that involved an individual named Omar. Wyatt responded that he did not know anyone by that name, told Detective Stott that he would come out to talk, shut the door, and exited out the back door to speak with the officers outside.

After stepping outside, a male officer (likely to be Officer Medina) identified himself, stated that the police were investigating a drug trafficking complaint, and then physically escorted Wyatt into the residence by placing his hand on Wyatt's lower back and directing Wyatt into the house. Initially, Reed testified that police were never given consent to enter the residence. Then, on cross

7

examination, Reed conceded that the male officer asked whether he could come in and Wyatt gave his consent, stating that he "had nothing to hide." However, this conversation took place as Wyatt was already being escorted into the residence.

Immediately after entering the house, the officer exited and returned with a second officer. Next, the officer let two additional officers in through the front door, making a total of four officers in the residence. Reed and Wyatt were escorted to the living room by the officers. Wyatt persisted in asking the officers what was going on, why they were there, and whether the officers had a warrant. As to Wyatt's demeanor, Reed testified that Wyatt was calm at first but became upset when the officers remained in the residence and did not answer his questions. At some point, a female officer (likely to be Detective Stott) asked Wyatt for permission to search the house. Wyatt refused, stating that he did not think the officers were authorized to search without a warrant. The female officer told Wyatt that a warrant was not necessary if he gave his consent; otherwise, search dogs would be used if consent was not given. Based on this response, in addition to the fact that officers were already looking around the kitchen, bedroom, and living room, Wyatt gave the officers consent to search the residence. Thereafter, police seized the taser gun, scale, and plate containing cocaine residue that were mentioned earlier.

### III. Analysis

The parties agreed that resolution of Wyatt's motion depends on the court's credibility determination. Thus, if Reed's account of events is credited—where police sought "consent" while they were escorting Wyatt into the home, began searching the home prior to consent to search, and told Wyatt that search dogs would be summoned absent consent to search—Wyatt is entitled to the relief he seeks. Conversely, the parties believe that Wyatt's motion should be denied if the Teutonia

8

Avenue residence was entered under the circumstances described by Detective Stott and Officer Medina.

The court entertained oral argument as to the issue of credibility after the close of all testimony. Defense counsel argued that Reed's testimony comports with the fact that Wyatt did not want the officers to enter or search the residence, as evidenced by his refusal to open the front door to Detective Stott, his repeated questions as to the officers' presence, his questions regarding a search warrant, and his eventual anger. Counsel for the government argued that Reed should not be credited based on inconsistencies in her testimony. In particular, the government noted Reed's testimony that she went to the front door with Wyatt because the police were there, even though Reed could not have known that police were at the door before it was answered. In addition, Reed's testimony that consent was given based on the threat to bring in search dogs is inconsistent with her testimony that the police were already searching the house. According to the government, if Reed's claim is true and the police were truly doing as they pleased, there would be no incentive to consult Wyatt. Moreover, the government claims that entry and search, as described by Detective Stott and Officer Medina, accords with Wyatt's belief that his personal cocaine use was "no big deal" and that he "had nothing to hide." The later belief is reflected in the signed statement that Wyatt made a few hours after his arrest and was admitted by Reed on cross examination. The government also notes Reed's personal feelings for Wyatt as evidence of her bias and the fact that Reed had been drinking on the day of the search.

Based on these arguments, the court concludes that the police were aware of the fact that Wyatt did not want them to enter or search his home. At the same time, it is also clear that Wyatt believed he would not face consequences were the police to enter or to search the residence. Wyatt stated that he had "nothing to hide" because he was not selling drugs, acted casually, wanted the matter resolved

9

quickly, and believed that police were pursuing an individual named Omar, not him. Under those circumstances, the court finds it more reasonable that Wyatt would voluntarily consent to the entry and search of his residence, as asserted by Officer Medina and Detective Stott, even though Wyatt would have preferred the police to leave.

Awareness that Wyatt did not want the police to enter or search the residence does not preclude the police from seeking consent. Most would prefer that police not enter their home and many become upset at the possibility of their home being searched. This does not lead to the conclusion that consent is coerced and involuntary. United States v. Marin, 761 F.2d 426, 434 (7th Cir. 1985)(consent is not overcome by the fact that the may have been upset or by the fact that the was told a warrant would be obtained if she refused to consent); United States v. Stone, 471 F.2d 170, 173 (7th Cir. 1973)("[t]o hold that the mere condition of being 'upset' by the presence at one's home of F.B.I. agents is enough to make any consent the product of coercion might effectively foreclose almost all searches conducted pursuant to a voluntary consent.").

For all the reasons discussed, the court accepts Detective Stott's and Officer Medina's account of the November 5, 2004 entry and search and concludes that both were consensual. Accordingly, the court will recommend that Wyatt's motion to suppress be denied.

### RICHARDSON'S MOTION TO SUPPRESS

Ramond Richardson ("Richardson") filed a motion to suppress evidence seized from the search of his residence, located at 4050 N. 17th Street. As grounds, Richardson also claims that law enforcement officials failed to obtain voluntary consent before entering and searching the residence. On April 11, 2005, this court held an evidentiary hearing to address Richardson's motion. Richardson appeared in person and by his attorneys, Michael Hart and Murali Jasti. The government appeared

10

by Assistant United States Attorney Richard Frohling and presented testimony by Milwaukee Police Detective Carol Starr ("Detective Starr") and Milwaukee County District Attorney's Office Investigator Paul Bratonja ("Investigator Bratonja").

Richardson's girlfriend, Sunshine Johnson ("Johnson"), was called to testify on his behalf. Shortly after taking the witness stand, Johnson stated that she wished to consult with an attorney before testifying. Based on the possibility that Johnson might expose herself to criminal liability, the evidentiary hearing was adjourned until April 21, 2005, at which time Johnson indicated that she had consulted with counsel and was willing to testify.

### I. Investigator Bratonja

As will be discussed, Johnson's testimony was markedly different from the testimony of Detective Starr and Investigator Bratonja. According to Investigator Bratonja, he and several other law enforcement officials approached the residence with the intent of arresting Richardson, pursuant to a warrant that was issued on December 14, 2004. The officers believed Richardson was in the lower unit, 4048 N. 17th Street, but there was no answer when they knocked on the door. Then, one of the officers knocked on the door of the upper unit of the duplex, 4050 N. 17th Street. A woman later determined to be Sunshine Johnson came to the door, identified herself as Sasha Jones, and denied knowledge of Richardson. Johnson was asked whether the officers could enter her residence in order to obtain access to the lower unit, and Johnson agreed. Accordingly, the officers and Johnson headed towards the upper unit.

Meanwhile, Investigator Bratonja, who had knocked on the door of the lower unit, called Detective Starr to report their location and to discuss certain observations—the window shades were open and the residence appeared neat—that appeared at odds with the residence being a drug house.

Shortly after talking to Detective Starr, Investigator Bratonja spoke with a neighbor who was walking past the residence. The neighbor recognized a mug shot of Richardson and said that Richardson stays in the upper unit, not the lower unit. Investigator Bratonja radioed this information to the other officers, who had already passed through the upper unit and were headed towards the lower unit via the back stairwell. Investigator Bratonja met Johnson and the other officers on the back stairwell and informed Johnson that she could be charged with obstruction of justice if she lied to the police. Johnson then admitted her true identity and indicated that Richardson was hiding in a closet in the living room.

At that point, Investigator Bratonja and the other officers entered the upper unit residence. A couch had been pushed in front of the closet door and a young child was seated on the couch. Investigator Bratonja picked up the child, handed her to Johnson, and entered the closet where Richardson was found sitting on the floor. Intending to move Richardson to the couch, Investigator Bratonja checked the couch for weapons. He recovered a loaded Taurus .45 caliber pistol under one of the cushions. Investigator Bratonja then seated Richardson on a chair less susceptible to hidden weapons, while the other officers conducted a protective sweep. No other persons or incriminating evidence was found at that time, and Richardson was arrested and removed from the residence. Based on the discovery of the pistol and the potent smell of marijuana within the residence, Investigator Bratonja called Detective Starr, the lead investigator assigned to this case. Detective Starr came to the residence to request Johnson's consent to search the residence.

**II. Detective Starr**

According to the testimony of Detective Starr, she told Johnson that the officers wanted to make certain that there were no drugs or other guns in the residence and that the officers did not intend

12

to get Johnson in trouble. Johnson responded "whatever is in here, you can have it. It's not mine." Although Johnson expressed concern that Richardson's presence might hinder her certification as a day care provider, Johnson was cooperative at all times. In fact, shortly after her discussion with Detective Starr began, Johnson readily gave her consent to search the residence, an attic area, and two vehicles that were parked outside. Johnson also signed Detective Starr's memo book in recognition of her consent and openly discussed certain of Richardson's activities that Johnson suspected to be drug-related. (Hearing Ex. 4.). While Johnson was advised that children and guns are a dangerous combination, Johnson's relationship and custody of her daughter were never threatened by Detective Starr or any of the other officers. Detective Starr testified that Johnson was completely forthcoming and that no convincing was necessary.

The officers began to search the residence only after Johnson's consent was obtained. The search resulted in the seizure of the following items, which were stipulated by the parties for purposes of the pending motion to suppress:

- approximately 28 pounds of marijuana in 31 plastic bags, as well as 2 electronic scales (closet and/or floor of the east bedroom);
- approximately 25 grams of marijuana, a digital scale, and a loaded, Smith & Wesson .38 caliber Special revolver (top drawer of plastic storage bin in the east bedroom);
- approximately 11 grams of heroin, a digital scale, aluminum foil pieces, and plastic bags with corners missing (under mattress in the east bedroom);
- approximately 4 grams of marijuana, 0.4 grams of cocaine, a taser, aluminum foil, gallon-sized bags, and baggies with corners missing (kitchen); and
- approximately 57 grams of marijuana in 7 plastic bags (in white Chevrolet Caprice).

(Stipulation April 11, 2005.). While these items were being seized, Johnson never withdrew her consent or objected to the officers actions in any way.

13

### III. Johnson

Johnson's testimony directly contradicts the testimony of Investigator Bratonja and Detective Starr. According to Johnson, she agreed to let the officers use her residence to access the lower unit only after the officers persistently requested to do so. Then, after the officers passed through the residence, Johnson closed and locked the door. When the officers learned that the previous name provided by Johnson was false, they returned to Johnson's residence, threatened to arrest her, demanded to know her true identity, asked why she was lying, ordered her to tell them where Richardson was hiding, asked her where drugs were hidden, and told her that her daughter could be turned over to child protection services. Four to five agents re-entered Johnson's residence and immediately began searching for Richardson. Soon thereafter, Johnson heard an officer say "he is here" and heard Richardson cursing at the officers. Based on those remarks, rather than direct observation, Johnson assumed that Richardson had been found. She never told the officers where Richardson was hiding, did not know how her daughter got onto the couch in the living room, and did not know who moved the couch in front of the closet.

When Detective Starr arrived she threatened to have Johnson's daughter taken by family services if she did not consent to the removal of evidence that the agents had already found in the residence. Due to those threats, Johnson signed Detective Starr's memo book without reading it. Thereafter, officers seized the stipulated evidence listed above—all of which Johnson denies knowledge.

### IV. Analysis

For several reasons, the court does not find Johnson to be a credible witness. Johnson conceded that she lied to agents about her identity and her knowledge of Richardson to help

14

Richardson avoid detection.  In addition, Johnson admitted that she spoke with Richardson during the time that the evidentiary hearing was adjourned, after being advised not to discuss this case.  While Johnson claimed that she did not speak with Richardson about matters relevant to the evidentiary hearing, her visit to Richardson while he was incarcerated weighs against her credibility.  Moreover, Johnson's testimony is not reflected in the notes contained in Detective Starr's memo book, and Johnson's claim that her consent was involuntary contradicts her written consent.  Johnson's professed total lack of knowledge regarding the drugs that were seized is belied by the quantity of marijuana that was discovered, the testimony of Detective Starr and Investigator Bratonja that the smell of marijuana was potent throughout the residence, and the notes in Detective Starr's memo book, which reflect Johnson's suspicions as to Richardson's drug trafficking activities.  Furthermore, Johnson's testimony that she did not position the couch in front of the closet and place her daughter on the couch appears highly improbable in light of the fact that no one besides Johnson, Richardson (who was inside the closet) and Johnson's young daughter were home at the time of Richardson's arrest.  Moreover, the alleged drastic measures engaged in by the officers is inconsistent with the nonviolent and relatively calm circumstances under which all witnesses testified that Richardson was arrested.

   Ultimately, it is this court's belief that Johnson's testimony reflects the stake she has in Richardson's welfare, as well as her own potential for exposure.  Accordingly, the court finds that the testimony of Detective Starr and Investigator Bratonja more accurately reflect the entry and search of the 17th Street residence and will recommend that Richardson's motion to suppress be denied.

**IT IS THEREFORE ORDERED** that the defendants' motions to strike the sentencing allegations from the indictment are **granted.**

**IT IS THEREFORE RECOMMENDED** that Wyatt's motion to dismiss the 21 U.S.C. § 851 information be **denied.**

**IT IS FURTHER RECOMMENDED** that Wyatt's motion to dismiss be **denied.**

**IT IS FURTHER RECOMMENDED** that Wyatt's motion to suppress be **denied.**

**IT IS FURTHER RECOMMENDED** that Richardson's motion to suppress be **denied.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order or recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation and order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this <u>12th</u> day of May, 2005.

> s/AARON E. GOODSTEIN
> United States Magistrate Judge